## HABERMEL v. MONG et al.

Circuit Court of Appeals, Sixth Circuit.
April 12, 1929.

No. 5166.

Gardner K. Byers, of Louisville, Ky., for appellant.

Martin T. Kelly, of Pineville, Ky., for appellees Stump and wife.

D. O. Harris, of Harriman, Tenn., and Thomas G. McConnell, of Knoxville, Tenn., for appellees Stump, Mong, and Russell.

Before MOORMAN, MACK, and HICKENLOOPER, Circuit Judges.

MACK, Circuit Judge. Appeal from a decree canceling a lease to appellant executed by appellees Stump and dismissing appellant's cross-bill brought against all appellees.

The lease to Habermel was executed under the following circumstances: H. R. Stump owned 85 acres in the oil-producing section of Tennessee. Early in 1925 he was persuaded to give the oil lease to Habermel on the representation made by one Cook, in our judgment known to Habermel, that Habermel would at once begin to drill a well, indeed, that tools were being held in readiness pending the signing of the lease, and that if the land were found to contain oil it would be promptly developed.

The lease as finally signed by Stump and his wife on February 18, 1925, read:

"That the said party of the first part, for and in consideration of the sum of one ($1.00) dollar to them in hand well and truly paid by the said party of the second part, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained on the part of the said party of the second part, to be paid, kept and performed, have granted, demised, leased and let, and by these presents do grant, demise, lease and let unto the said party of the second part, their (sic) heirs, executors, administrators or assigns, for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines, and of building tanks, stations and structures thereon to take care of the said products, ALL that certain tract of land [description of property].

"It is agreed that this lease shall remain in force for the term of two years from this date, and as long thereafter as oil or gas, or either of them, is produced therefrom by the party of the second part, their heirs, executors, administrators or assigns."

(Royalty provisions.)

"Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm. And further to complete a well on said premises within five months (5) from the date hereof, or pay at the rate of fifty ($50) dollars, quarterly in advance, for each additional three months such completion is delayed from the time above mentioned for the completion of such well until a well is completed; and it is agreed that the completion of such well shall be and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease. Such payments may be made direct to the lessors or deposited to their credit in Farmers' & Citizens' Bank, Clendennin, West Va. *The said second party covenants to begin a well on said land inside of sixty (60) days and to use due diligence to complete a well, and if oil is found in paying quantities, they will continue drilling additional wells until the said land is fully and properly developed.*

"It is agreed that the second party shall have the privilege of using sufficient water from the premises to run all necessary ma-

chinery and at any time to remove all machinery and fixtures placed on said premises; and, further, upon the payment of one ($1.00) dollar, at any time, by the party of the second part, their heirs, successors or assigns, to the parties of the first part, their heirs, executors, administrators, or assigns, said party of the second part, their heirs, executors, administrators, or assigns shall have the right to surrender this lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms, shall cease and determine, and this lease become absolutely null and void."

The italicized sentence was inserted by Stump in his own handwriting in the otherwise filled in printed form sent to him by Habermel for his signature.

Drake well No. 1 was at that time producing oil on a neighboring lot about 900 or 1,000 feet from the present location of the Stump well, which is near Stump's boundary line. Drake well No. 2 was then being drilled 500 feet further away, and there were other wells at about the same distance in other directions. Drake well No. 3, which is only 500 feet from the Stump well, was, however, begun after this time, and not completed until February, 1926. The testimony, while clearly establishing that pools of oil are not migratory, strongly indicates that, once a pool is tapped by a well, all the oil it contains will be drained from under neighboring lands unless offset wells are speedily drilled thereon; but the evidence is unsatisfactory as to how near to one's boundary line a neighbor's well must be to make the drilling of an offset well a reasonable precaution. However that may be, Stump, when he signed the lease, believed and made clear that such offset well or wells must be promptly drilled on his land. Subsequent events showed that the three productive Drake wells were directly in line with the Stump well, making it highly probable that they all tapped the same long narrow pool of oil, and that, when the Stump well began to flow, the production of the Drake wells dropped from 80 barrels to 50 or 55.

Habermel took no further action in respect to development of the land after obtaining the lease, although in answer to each of two letters written by Stump early in April, 1925, earnestly requesting the commencement of operations and calling attention to the 60-day clause, he had promised to begin almost immediately. We are satisfied from the evidence that he had no intention of carrying out these promises, and that from the beginning of the negotiations it was his purpose to hold the lease for speculative purposes; that is, to keep the property idle until the lease could be either assigned at a premium or surrendered when he should decide that it was worthless.

On June 27, 1925, Stump and wife filed a bill in the state court for cancellation of the lease on the ground of fraud and nonperformance of the 60-day covenant. Upon service by publication, a decree by default was taken November 18, 1925. Meanwhile, on July 17th, Habermel sent $50 to the Bank of Clendennin for deposit to Stump's credit, pursuant to the lease provision governing delay rentals. The bank, however, having been previously instructed by Stump not to accept any money tendered by Habermel, refused to receipt for the $50, but instead informed Habermel that the money had been placed in the bank's rental account, and a check drawn against it in favor of Stump. This procedure was customary among local banks in similar situations; it seems that such sums were subject to payment upon request of either party. Habermel continued to send checks each quarter during the ensuing two years, and the bank treated each in the same fashion. Nothing was paid out to Stump.

In December, 1925, Stump leased the land to appellee Mong, who promptly assigned to appellee Russell Producing Company. There is conflict as to how much the latter knew of the foregoing facts, other than that Stump had given an earlier lease, which had been canceled by court decree. Since the question of notice is immaterial under our views hereinafter set forth, we pass the evidence on this point. Oil was struck at the end of April, 1926. Early in the following month Habermel, pursuant to the Tennessee statutes governing default judgments against nonresidents, petitioned for and was granted a reopening of the cause, and subsequently filed "original attachment bill" in the nature of a cross-bill against Mong and the Russell Producing Company, as well as the Stumps. The bill prayed for cancellation of the junior lease, an accounting for the oil theretofore produced, and a declaration of appellant's right to possession of the land and the well erected thereon by the Producing Company. The latter appellee removed the cause to the District Court, and appellant's motion to remand was denied. After hearings, the court entered the decree herein appealed from.

Preliminarily, appellant in his brief, although there are no assignments of error in respect thereto, questions the propriety of the removal from the state court, in view of the fact that the Stumps were the original

plaintiffs in the proceedings there commenced. We are entirely clear that, under the circumstances, removal was proper. Although there is a decided conflict of opinion as to how far an original plaintiff has the right of removal when he has been made defendant to a counterclaim or cross-bill (see cases in 28 USCA § 71, note 668), no case has held that a new party brought in by a cross-bill, as against whom the original defendants ask affirmative relief not involved in the original proceeding, may not remove the entire cause. The decision of West v. Aurora City, 6 Wall. 139, 18 L. Ed. 819, is distinguishable, in that no new parties were brought in, and that the original defendants raised purely defensive issues, as well as that the case was decided under an earlier, somewhat different act. As to this, see Price & Hart v. T. J. Ellis & Co. (C. C.) 129 F. 482, at page 483.

■ We come, then, to a consideration of the merits of the controversy. It is well established that a promise to dig a well or pay delay rental, or a condition in a lease that, unless delay rental be paid, the lease shall terminate if a well be not drilled within a certain time, is ordinarily satisfied by the payment of delay rental. Allegheny Oil Co. v. Snyder, 106 F. 764 (C. C. A. 6); Aggers v. Shaffer (C. C. A.) 256 F. 648. So, too, in Tennessee. Morris v. Messer, 156 Tenn. 54, 299 S. W. 782. But in some jurisdictions a covenant to develop reasonably and to protect the interests of the lessor is implied, and is enforceable, notwithstanding the delay rental provision. Lyon v. Union Gas & Oil Co., 281 F. 674 (C. C. A. 6). Sometimes, too, the delay rental clause is construed as providing, not for an alternatively permissible performance, but merely for liquidated damages. Huggins v. Daley (C. C. A.) 99 F. 606, 48 L. R. A. 320. If the lease contains no delay rental clause, unreasonable delay on the part of the lessee in beginning to drill may work a forfeiture or breach of implied condition. Logan N. G. & F. Co. v. Great Southern G. & O. Co., 126 F. 623 (C. C. A. 6). Cf. Tennessee O., G. & M. Co. v. Brown, 131 F. 696 (C. C. A. 6). And, similarly, if the delay rental provision is referable only to the drilling of the first well, the lease may be terminated for nonperformance of an express or implied promise to continue development. Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801; Foster v. Elk Fork O. & G. Co. (C. C. A.) 90 F. 178. Regardless of whether or not, and, if so, when, a gas and oil lease creates a vested interest in the lessee, it is clear from the foregoing cases that, at least when the parties have not fully covered the subject of delay by rental provisions, the lessee's rights terminate upon nonperformance of the condition that he develop the property promptly, a condition deemed implicit in every gas and oil lease—whether or not expressly set forth therein and reinforced by a forfeiture clause —because only in this way can the lessor secure protection and his share in the profits.

Appellant contends that the present case is similar to those first cited, wherein payment of the delay rentals is regarded as an entire fulfillment of the lessee's obligation or of the conditions of the lease. He urges that the inserted handwritten sentence in the lease should be construed with the preceding printed sentences, so as to give effect to each of them; in other words, that Habermel was bound either to perform a single promise to begin a well in 60 days, use due diligence to complete it, and have it finished in 5 months, or in default of such performance to pay $50 quarterly from the end of the 5 months.

■■ But, as was pointed out by this court in construing an oil and gas lease in Hopkins v. Zeigler, 259 F. 43 (C. C. A. 6), the fact that two clauses can conceivably be read together by limiting each to a meaning not inconsistent with the other, is not necessarily decisive; a fair construction may require that one of the clauses be read so broadly as to eliminate the other. The interpretation contended for by appellees is that Habermel was to begin a well in 60 days and complete it with due diligence, no delay rentals or other alternative performance being permissible; i. e., that the inserted written sentence is inconsistent with the printed provisions and supersedes them. In our judgment, this contention is sound. The promise to begin in two months is absolute; the language in which it is expressed contains no suggestion that the lessee has reserved any alternative method of performance. It would presumably not have been inserted by the lessor in his own handwriting on the form lease submitted by lessee, if it were to be practically nugatory; yet under appellant's contention it would add nothing, except at most an inevitably nominal claim for damages, since the lessor could not recover any substantial damages for mere breach of a covenant to *begin* drilling, if the lessee had the right to postpone *completion* of the well upon payment of rentals not dating from the time fixed for the beginning of drilling. As the part of the inserted sentence giving 60 days in which to begin is therefore not subject in any way to the printed clauses allowing the

alternative of delay rentals, the second part of the sentence, requiring completion within a reasonable time, is in our judgment likewise meant to impose an absolute obligation, not modified by the printed provisions.

This conclusion is fortified by the fact that the remaining parts of the sentence, with which we are not here concerned, also clearly impose an absolute obligation. Were there any doubt as between appellant's and appellees' interpretations on a consideration of the text and context of these clauses of the lease, it would be at once dispelled by a consideration of the circumstances surrounding the making of the lease, as hereinabove set forth. Oil and gas leases, moreover, prepared, as they customarily are, by the lessee, and as was the printed provision upon which appellant relies in this case, are usually construed most strongly against him and in favor of the lessor. Morris v. Messer, supra; Huggins v. Daley, supra.

As this promise to begin drilling in 60 days and to complete within a reasonable time thereafter is absolute, its performance must be deemed a condition to the continuance of the lease; Habermel's inaction for well over 4 months, together with his failure to indicate, even after warning, any sincere intention ever to begin development constituted a breach of the condition.

No question of estoppel, election, or practical interpretation of the contract by the parties arises from the receipt by the Bank of Clendennin of the delay rentals sent by Habermel. The bank was not Stump's agent to receive payment; it had been expressly forbidden to accept money for Stump; it did not purport to do anything more than hold the money in its own account, subject to the demand of whoever was entitled thereto. The bank's procedure, therefore, did not constitute receipt of the money by Stump, even though the remittance to the bank would have sufficed for performance of Habermel's obligation, if the lease had continued in full force.

In view of the conclusions thus reached, it becomes unnecessary to consider whether the contract was induced by fraud, whether there was in fact such danger that Stump's oil would be drained by the Drake wells as to entitle him to relief under an implied covenant of protection, even if the delay rental provisions were in effect, and whether, even if the senior lease were good as against the Stumps, the other appellees would nevertheless be protected by the default decree of 1925.

Decree affirmed.